******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JOY M. RENDAHL, ADMINISTRATRIX (ESTATE OF
FRANCES M. RENDAHL) *v.* FRANK N.
PELUSO ET AL.
(AC 38181)

Sheldon, Alvord and Gruendel, Js.

*Argued November 30, 2016—officially released April 28, 2017\**

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Povodator, J.)

*Philip Russell*, with whom, on the brief, was *Cather-*

*ine Keenan*, for the appellants (plaintiffs).

*Robert C. E. Laney*, with whom was *Shivani J. Desai*,
for the appellees (defendants).

*Opinion*

SHELDON, J. The plaintiff, Joy M. Rendahl, individually and as administratrix of the estate of her deceased mother, Frances M. Rendahl, brought this action against the defendants, Frank N. Peluso and his law firm, the Law Offices of Frank N. Peluso, P.C. (collectively, the defendant), to recover damages, inter alia, for breach of fiduciary duty, legal malpractice, and wilful, wanton, and reckless misconduct based upon the defendant's alleged mishandling of his responsibilities as the executor of and the attorney for the estate. Following an eight day trial and two days of deliberations, the jury returned a verdict in favor of the defendant on all counts. Thereafter, the plaintiff filed two motions to set aside the verdict, alleging, in the first motion, that the court erred in declining to accept an earlier verdict by the same jury, assertedly awarding her punitive damages on her claim of breach of fiduciary duty, and requiring the jury, under supplemental instructions, to continue its deliberations and make further factual findings before returning its final verdict; and, in the second motion, that the court erred in refusing to admit certain relevant, material evidence at trial. On June 30, 2015, the trial court, *Povodator*, *J.*, denied both motions. This appeal followed.

On appeal, the plaintiff reasserts the claims presented in her motions to set aside the verdict, and seeks reversal of the court's judgment based upon the denial of those motions. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the plaintiff's claims on appeal. The plaintiff first met the defendant in 1961, when she was eleven years old. At that time, the defendant's father was helping to construct the plaintiff's family home in Greenwich, where the plaintiff still resides. In 1975, the plaintiff's father hired the defendant to draft wills for himself and his wife, the plaintiff's mother, Frances M. Rendahl. The defendant was also asked to create and administer two income trusts for members of the plaintiff's family, specifically, one for the benefit of her mother, for the remainder of her mother's life; the other for the benefit of the plaintiff, until she reached the age of thirty-five. The plaintiff testified that the defendant performed his role as trustee "reasonably well" until her mother's death in 2006.

When the plaintiff's mother died on October 29, 2006, she left behind an estate comprised of cash, stocks, personal property, and real property with a total estimated value of approximately $3,083,982.[1] The plaintiff, an only child, was the sole beneficiary named in her mother's will. The defendant, who had helped to draft the will, was named in the will as one of two coexecutors of the decedent's estate. Accordingly, when she died, he promptly filed an application for administration

of the estate in the Probate Court, for the district of Greenwich. The Probate Court, *Hopper, J.,* approved that application on November 3, 2006. Shortly thereafter, on November 6, 2006, the defendant was appointed as the sole executor of the estate.[2] Under the terms of a November 1, 2006 engagement letter, the defendant informed the plaintiff that, in exchange for his services as executor, he would charge an executor's fee equal to 2.5 percent of the estate's gross value.[3] Thereafter, under the express terms of the will, the defendant, as executor, hired the codefendant, his own law firm, as the attorney for the estate.[4] On that same day, the defendant executed a second engagement letter between himself, as executor, and his law firm, as attorney, to perform legal services on behalf of the estate for an additional fee equal to 2.5 percent of the estate's gross value.

The following month, December, 2006, the defendant met with the plaintiff to discuss the administration of the estate. At that meeting, the plaintiff gave the defendant several documents that would be necessary for his work as executor, including stock certificates, health care bills, utility bills, and insurance policies. Thereafter, the defendant began to marshal the assets of the estate, which included: $14,925 in personal funds; a stock portfolio valued at approximately $331,625; real property in Connecticut with an appraised value of approximately $2.3 million; real property in Florida[5] with an appraised value of approximately $400,000; two joint bank accounts with a combined value of $25,332; and miscellaneous property with a reported value of $6551. The defendant ultimately reported on the estate's federal estate tax return that the estate had a gross value of approximately $3.083 million at the time of the decedent's death.

Between December, 2006, and July, 2007, the defendant liquidated a substantial portion of the estate's stock portfolio, producing an additional $278,434.83 in cash assets for the estate. The defendant used those assets to pay off $273,445 in estate debts and expenses, including funeral expenses, accountant fees, probate fees, property taxes, unpaid medical bills, utilities charges and mortgage payments, and repairs to the roof of the Florida property.

As early as January, 2007, the plaintiff's relationship with the defendant began to sour. Specifically, the plaintiff became dissatisfied with the defendant's handling of certain estate assets and his unresponsiveness to her questions and concerns. As a result of these concerns, the plaintiff met with the defendant to discuss the administration of the estate. Also at this meeting, the plaintiff informed the defendant that she had a personal claim against the estate in the amount of $536,914, for funds she had loaned to her mother during her mother's lifetime, and asked him how she should go about per-

fecting that claim. The defendant responded by informing her that, although she was the sole beneficiary of the estate, he was not her personal attorney, and thus she should hire her own attorney to obtain such advice. Acting on that suggestion, the plaintiff hired attorney Daniel Johnson to perfect her claim against the estate. By April, 2007, the plaintiff and Johnson had provided the defendant with sufficient documentation substantiating her claim that the defendant listed it as a debt of the estate on the estate's federal estate tax return.

Several months later, on July 25, 2007, the defendant filed the estate's inventory with the Probate Court. In that filing, the defendant reported that the estate's Connecticut assets had a combined gross value of $2.65 million, of which $2.3 million was the appraised value of the decedent's Greenwich property. After accounting for a $749,834 mortgage on that property,[6] however, the defendant reduced the property's net value by that amount to $1.55 million, and reported on the inventory that the combined net value of the estate's Connecticut assets was approximately $1.9 million.

The following day, July 26, 2007, the defendant filed the estate's federal and state tax returns on Form 706 and Form CT-706, respectively. These forms, as submitted by the defendant, reported a tentative taxable estate of $1,475,451.[7] Because the reported value of the estate's Connecticut assets was less than $2 million, the estate was determined not to be subject to Connecticut's then existing cliff rate[8] of 7.2 percent tax on its total net assets. The following week, on July 30, 2007, the defendant received an "Opinion of No Connecticut Estate Tax Due," which was certified and signed by the Probate Court. As for the estate's federal estate tax return, the defendant reported on Form 706 that the estate had utilized a "maximum unified credit" of $780,800 to offset a potential liability of $545,244 in federal estate taxes, resulting in a net federal estate tax of zero dollars. On November 14, 2007, the defendant received an "Estate Tax Closing Document" from the Internal Revenue Service, confirming that the estate owed zero dollars in federal estate taxes.

Notwithstanding these favorable results, the plaintiff grew increasingly dissatisfied with the defendant's administration of the estate. Specifically, she had concerns about: (1) the defendant's invasion of her and her mother's joint bank account, which she claimed to be a nonprobate asset; (2) the commingling of her mother's income trust assets with the assets of the estate; and (3) the defendant's claim to a combined total of $151,687 in executor's and attorney's fees, which she believed to be excessive. Thus, in the spring of 2007, the plaintiff hired a second attorney, Sharon Schweitzer, to dispute the amount of the defendant's claimed fees and to seek his removal as executor of the estate. Ultimately, how-

ever, Schweitzer advised the plaintiff that it was too early either to contest the defendant's fees or to seek his removal as executor, and thus that she should wait until a later time before raising those claims.

The estate remained open for an additional eighteen months following the Internal Revenue Service's November, 14, 2007 estate tax closing letter. During that time, the defendant prepared the final account of the estate, which he filed with the Probate Court on March 20, 2009. Thereafter, on August 17, 2009, the Probate Court issued a certificate of devise with respect to the Greenwich property.

On June 1, 2009, the plaintiff submitted a letter to the Probate Court objecting to the fees charged by the defendant as the executor of and the attorney for the estate. Thereafter, the plaintiff resumed her efforts to dispute the defendant's fees and to remove him as executor of the estate. To that end, in December, 2009, she hired a third attorney, William Prout, to seek the removal of the defendant as executor of the estate, to dispute the defendant's claim for a combined sum of $151,687 in executor's and attorney's fees, and to defend against the defendant's claim for an additional sum of $125,000 in attorney's fees that he claimed to have incurred "to [recover] his [original] fees."[9]

Between January and March, 2010, the Probate Court held four hearings to address the parties' fee dispute. In those hearings, the Probate Court ordered the defendant to produce evidence justifying his claimed entitlement to $151,687 in fees for the work he had performed as executor of and the attorney for the estate. The defendant complied with the court's request by preparing and presenting, at the second hearing on the fee dispute, a sixty-two page document—later marked at trial as exhibit 88—in which he detailed the time and effort he claimed to have had spent performing services on behalf of the estate. After reviewing the defendant's submission, the Probate Court ruled in favor of the plaintiff by ordering that the defendant's total fees for past services be reduced from $151,687 to $60,000, and denying his claim for an additional $125,000 in fees allegedly incurred to collect his original fees. See *Peluso* v. *Probate Appeal*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-10-5013414-S, 2012 WL 898753, *1 (*Hon. Alfred J. Jennings, Jr.*, judge trial referee). On May 7, 2010, the defendant appealed from that decision to the Superior Court for the judicial district of Stamford-Norwalk. We will refer to that probate appeal as the "fee appeal."[10]

On April 11, 2011, the plaintiff filed an application to remove the defendant as executor of the estate. *Peluso* v. *Probate Appeal*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-11-6011567-S, 2015 WL 3522304,*4 n.4 (*Povodator, J.*). The Probate Court, *Hopper, J.*, ultimately granted that application as well,

ordering the removal of the defendant as executor. Id., *1. On October 7, 2011, the Probate Court appointed the plaintiff as administratrix of the estate, a position she retains to this date. The following week, on October 13, 2011, the defendant appealed from that decision to the Superior Court for the judicial district of Stamford-Norwalk. We will refer to that probate appeal as the "removal appeal."[11]

On December 19, 2011, the plaintiff commenced the present action, which the parties refer to as "the malpractice action."[12] On November 15, 2012, the plaintiff filed the operative second amended complaint in this action, in which she pleaded claims of breach of fiduciary duty; legal malpractice; wilful, wanton, and reckless misconduct; breach of contract; conversion; civil theft, in violation of General Statutes § 52-564; and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.

Thereafter, on November 4, 2013, the plaintiff moved to consolidate the malpractice action with the fee appeal and the removal appeal. The trial court, *Mintz, J.*, granted the plaintiff's motion to consolidate over the defendant's objection. Ultimately, both the fee appeal and the removal appeal were tried de novo to the trial court, *Povodator, J.*, in the same proceeding as the malpractice action was tried to a jury. See *Peluso* v. *Probate Appeal*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-10-5013414-S, 2015 WL 4879974, *1. The eight day jury trial took place between March 11 and March 25, 2015. On the second day of its deliberations, the jury ultimately returned a defendant's verdict on all counts of the operative complaint. Thereafter, the plaintiff filed, and the trial court heard and denied, two separate motions to set aside the verdict. This appeal followed. Additional facts will be set forth as necessary.

I

On appeal, the plaintiff first claims that the trial court erred in declining to accept the jury's initial verdict and in reinstructing the jury before sending it back to continue its deliberations. More specifically, the plaintiff argues that the court committed reversible error: (1) by failing to inform the parties that the jury's initial verdict included answers to interrogatories supporting an award of punitive damages to the plaintiff on her claim of breach of fiduciary duty; (2) by failing to accept what she describes as the jury's initial "valid punitive damage verdict" pursuant to Practice Book § 16-31;[13] and (3) by reinstructing the jury on the legal principles of liability and directing it to " 'start [its deliberations] from scratch,' " instead of "simply [directing] the jury to enter nominal damages on this charge" in support its preexisting award of punitive damages. The plaintiff asserts that these errors were prejudicial because they "caused a different result than justice required. Accord-

ingly, the plaintiff . . . requests a new trial, or alternatively, a hearing in damages with respect to the punitive damage award initially rendered by the jury."

The defendant responds that the trial court properly refused to accept the jury's initial verdict because the verdict form and accompanying interrogatories were incomplete, in that the jury had not filled out several necessary portions of the verdict form and interrogatories, and further, the interrogatories were neither signed nor dated by the jury foreperson, as the court had instructed. The defendant further argues that, to the extent that the jury *did* answer questions in the interrogatories, those answers were inherently contradictory, resulting in an initial verdict that was incomplete, inconsistent, and incomprehensible. The defendant thus argues that the court did not abuse its discretion in declining to accept the initial verdict pursuant to Practice Book § 16-31. With respect to the plaintiff's claims of error in instructing the jury after declining to accept its initial verdict, the defendant argues that the plaintiff failed to preserve such claims because she failed either to object to the court's supplemental instructions when the court discussed them on the record or to except to those instructions after they were given. In the alternative, the defendant argues that, even if this court were to reach the merits of the plaintiff's claims of instructional error, such claims are meritless because the challenged instructions were correct statements of the law. We agree with the defendant that the court properly declined to accept the jury's initial verdict and that the plaintiff's claims of instructional error are unreviewable because the plaintiff failed to preserve them.

The following additional facts and procedural history are necessary for our resolution of this claim. As more fully discussed in part II of this opinion, the jury received evidence in the malpractice action between March 11 and March 25, 2015. On March 26, counsel gave closing arguments on the plaintiff's then remaining claims of breach of fiduciary duty; legal malpractice against the defendant, in her capacity as administratrix; legal malpractice against the defendant, in her capacity as the sole beneficiary of the estate; and wilful, wanton and reckless misconduct.[14] After those arguments were completed, the court instructed the jury in accordance with a written jury charge, to which plaintiff's counsel neither objected nor excepted, either before or after it was given.

In its charge, the court instructed the jury generally that: "[The] plaintiff . . . claims that [the] defendant breached his fiduciary duty in his conduct as executor of the estate of Frances Rendahl . . . [and also] claims that [the] defendant's conduct went beyond negligence to the point that it could be characterized as wilful, wanton and reckless, which, if proven, might entitle [the] plaintiff to enhanced relief. . . . [The] defendant

has denied that he was negligent, that he committed legal malpractice and denies that he breached his duty as a fiduciary or that he acted wilfully and recklessly. . . . *This, then, is a case in which both liability and damages are in issue. Your task is to determine the extent, if any, to which [the] defendant is liable and the amount of damages, if any, the plaintiff is entitled to recover.*" (Emphasis added.)

In dealing specifically with the plaintiff's claim of breach of fiduciary duty, the court instructed the jury, inter alia, that: "[The] plaintiff has alleged that the defendant, acting as a fiduciary, engaged in numerous acts that constituted breaches of his fiduciary duty. . . . She must prove that the defendant was acting as a fiduciary, that the fiduciary breached this fiduciary duty *and that such breach of fiduciary duty caused the plaintiff damages. If you conclude that [the] plaintiff has satisfied all of these requirements and has established that her claimed injuries were proximately caused by the misconduct of [the] defendants, then she would be entitled to recover under this claim. If she has not satisfied all of the requirements, then [the] defendants are entitled to judgment on this claim.*" (Emphasis added.)

On the issue of compensatory damages for breach of fiduciary duty or legal malpractice, the court instructed the jury, inter alia, as follows: "Damages are intended to compensate [the] plaintiff for her losses and are not to be awarded in an effort to punish [the] defendant. You must attempt to put the plaintiff in the same position, as far as money can do it, that she would have been in had the defendants not been negligent. *In order to recover money damages, the plaintiff must prove that she suffered an actual injury. Unless the plaintiff proves an actual injury caused by negligence of the defendant, you cannot find for the plaintiff and award damages.* . . . [The] plaintiff has claimed that the wrongful conduct caused economic losses and to the extent you find those economic losses to have been proven, she is entitled to compensation for such losses. . . . Generally speaking, [the] plaintiff must prove by a preponderance of the evidence the amount of any damages to be awarded. The evidence must give you a sufficient basis to estimate the amount of damages to a reasonable certainty. Although damages may be based on reasonable and probable estimates, you may not award damages on the basis of guess, speculation or conjecture. Absolute accuracy as to the amount of damages is not required; only such definiteness as is appropriate under the circumstances. . . . You may not guess or speculate as to the nature or extent of the plaintiff's losses or damage. Your decision must be based on reasonable probabilities in light of the evidence presented at trial and not speculation or conjecture." (Emphasis added.)

On the issue of punitive damages as enhanced relief for either breach of fiduciary duty or legal malpractice, the court instructed, inter alia, as follows: "In addition to seeking compensatory damages for negligence and breach of fiduciary duty, [the] plaintiff also is seeking punitive damages based on wilful, wanton or reckless misconduct. If you find that [the] plaintiff has proven that [the] defendant acted wilfully, wantonly or recklessly, then you may award punitive damages. . . . Punitive damages are limited to the costs of litigation, including attorney's fees, less certain costs that are allowed in all cases which are called taxable costs. Within that limitation, the extent to which they are awarded is within your sole discretion. The parties have agreed that you are to determine whether to award punitive damages; they have agreed that I will do the actual calculation at a later date. Therefore, you are only being asked whether you have determined that punitive damages are to be awarded, but are not being asked to calculate the amount."

Finally, the court instructed the jury with regard to the verdict forms and interrogatories, inter alia, as follows: "When you retire, you will be receiving a plaintiff's verdict form. *There are blanks to be filled in, dollar amounts for damages you find to have been proven, if you conclude that* [*the*] *plaintiff has proven her entitlement to damages.* You also will be receiving a defendant's verdict form, if you conclude that [the] plaintiff has not proven that she is entitled to recover from [the] defendant. I am also submitting interrogatories which will assist you in reaching a verdict and calculating the amounts of damages, if any, to be awarded.[15] It also will assist the court in understanding the source of your determinations. . . . I also have provided a summary table in which you will fill in the dollar amount for each injury you conclude [the] plaintiff sustained without regard to theory. This is intended to avoid any overlap or duplication in damages. The reason I am doing this and asking you to use the summary table is that damages awarded can only compensate [the] plaintiff once for any element of damages that she has proven or that has been proven. . . . *The verdict form and the interrogatories must be signed in ink by the foreperson and dated.*" (Emphasis added; footnote added.)

Following these instructions, the court inquired as to whether counsel wished to take exception to any of its jury instructions. The plaintiff's counsel responded, "No, Your Honor. Thank you."

Jury deliberations began after the instructions were completed and continued into the following day, March 27, 2015. In the latter part of that afternoon, the jury sent the court a series of three notes. The first note, which was marked court exhibit 18, was received at 3:43 p.m. Upon receiving the note, the court first read it to itself, then announced on the record that it stated

that the jury had reached a verdict. After summoning the jury and taking a roll call, the court was handed the jury's verdict form and accompanying interrogatories in open court.

The court initially began to read the jury's verdict form and interrogatories to itself. Then, however, without showing them to or discussing their contents with counsel, the court addressed the jury as follows: "All right. Ladies and gentlemen, we have a problem of sorts. Let me explain the problem. . . . In interrogatory number four, you indicate yes to some of the subsections indicating certain things that you claim were done improperly in the fiduciary sense.[16] You then, on number five, say that . . . did [the] plaintiff prove that the estate suffered damages or losses and you answer yes and then there are zeros for all those losses.[17] You can't have proved losses by zero. . . . You are . . . entitled, if you feel it appropriate, to award what I would call nominal damages, but if you're saying damages would actually exist, then it should be something more than zero; it could be a dollar, it could be ten dollars, it could be a hundred dollars. Nominal. Either it should be no damages proved or damages were proved but a nonzero amount." (Footnotes added.) The court then returned the initial interrogatories to the jury and instructed the jury to continue its deliberations.

Immediately after making these remarks, which were directed exclusively to particular interrogatories concerning the plaintiff's claim of breach of fiduciary duty, and excusing the jury from the courtroom, the court addressed counsel, outside the presence of the jury, as follows: "As you may have gathered there appears to be that inconsistency. I don't know if anyone wants to be heard on that, but I think that . . . I had to instruct them that they could give nominal damages . . . . I mean, technically I could accept zeros and the appellate courts have said that they are not going to reverse if you have a plaintiff's verdict of zero . . . but I'm not going to get into that as long as I've spotted it early enough. It's either going to be that they are going to change that they proved damages to 'no' or they are going to say nominal damages or they are going to decide no oops, we really meant to put nontrivial numbers; I don't know what it is. . . . [A]nyone wish to be heard further on that?" The plaintiff's counsel replied "No."

Shortly thereafter, the jury sent out the second note, which the court marked as court exhibit 19. In that note, the jury requested further clarification as to how it was to "derive" compensatory damages. The second note read, more specifically, as follows: "We put $0 in [the] spot where damages should <u>not</u> be awarded. We left in blank spots where damages need to be awarded. Where do we derive these numbers from?"[18] (Emphasis in original.) After the court read aloud the note to coun-

sel, the plaintiff's counsel stated, "I think they have to be instructed." The court agreed, stating: "I'm going to tell them that they need to find that [the] plaintiff has proven by a preponderance of the evidence the damages, and they have to derive it from the evidence they were presented with, and if they cannot they have to decide whether or not that is a failure of proof." The court also stated that it would provide the jury with a fresh set of interrogatories.

Thereafter, in an additional set of supplemental instructions, the court instructed the jury, inter alia, as follows: "Damages are something that [the] plaintiff must prove and . . . when you say, where do you derive it from, you need to derive it from the evidence that has been presented to you in court. If you conclude that [the] plaintiff has met her burden of proving damages as to any or all of the claims that you think she's proven she is entitled to the damages that you believe she has proven. If you find that she hasn't submitted sufficient proof for you [to] conclude with reasonable certainty what those damages are then she hasn't proven damages and she's not entitled to damages. *Damages, you know, you have to prove fault, proximate cause, damages. It's all of these things, all of these elements are required.* And if you only get to yes, somebody did something wrong and yes, there was proximate cause, we don't know what it is, then there's a failure of proof. . . .

"It's for you to determine what the damages were based on the evidence presented. Has [the] plaintiff sustained her burden of proof on each of the elements . . . for each aspect of wrongful conduct you need to be able to say okay, and the damages resulting from that are X dollars with whatever level of confidence you think is appropriate. But the burden of proof is on the plaintiff. All right. . . . The [courtroom] clerk is going to give you another set of interrogatory forms *so you can start from scratch.* The . . . numbers only need to be put in where you find that there was some kind of liability; if you leave it blank, I'm assuming that you don't even find liability. In other words, the idea of putting in numbers is, [the] plaintiff . . . has proven that there was a certain type of liability. If there's a number that you can figure out, you put in that number; if it's zero, that means [that the] plaintiff didn't prove it or something of that nature. If [the] plaintiff did not prove a particular form of liability you can just ignore that for damages because there's no need to worry about damages on something that hasn't [been] proved with respect to liability." (Emphasis added.) The plaintiff did not object or take exception to these supplemental instructions.

The jury was then returned to deliberate for a third time with a fresh set of interrogatories, the court then noting that the jury's initial verdict form and interroga-

tories would have to be marked as court exhibits. Before they could be marked, however, the defendant requested that the jury's first set of interrogatories be sent in to the jury room so that the jurors could transcribe their prior findings onto the fresh set of interrogatories.[19] The court agreed with this suggestion and, without first marking the initial jury interrogatories as a court exhibit, instructed the clerk to deliver those interrogatories to the jury with the further instruction, "Just tell them to keep, preserve the old one. Tell them to preserve the old one." The plaintiff voiced no objection to this proposal, and so the jury's initial interrogatories were sent back into the jury room for the jury's reference. The court then stood in recess.

Shortly before the end of the day, the court received the jury's third and final note, which was marked as court exhibit 20. This note again reported that the jury had reached a verdict. Before taking a roll call, the court requested, and the parties stipulated, to the waiving of the second reading of the interrogatories. The court then called the roll of the jury, confirmed that each juror was present, and then received the jury's verdict and interrogatories. This time, on the defendant's verdict form, which was duly signed and dated by the foreperson, the jury reported that it had reached a defendant's verdict on each of the plaintiff's claims. In the accompanying interrogatories, which were also signed and dated by the foreperson, the jury provided answers to interrogatories as to each of the plaintiff's claims of liability that were consistent with its decision to return a defendant's verdict on all claims.[20] The court thereupon read the verdict form and interrogatories aloud in open court. Thereafter, it read the verdict form aloud a second time and asked the jurors whether that verdict, as it had been read back to them, was their true and unanimous verdict. The jurors all replied, "Yes." The court finally ordered that the verdict be accepted and recorded as it had been read. Neither counsel requested that the jury be polled.

On or about April 10, 2015, the court received a letter, dated March 31, 2015, from one of the six jurors in the malpractice action. In that letter, which was later marked as court exhibit 24, the juror indicated that the jury had misunderstood the court's instructions and intended to find in favor of the plaintiff on several of her claims. The letter also indicated that the jurors had been unaware that the defendant could have been "found liable despite zero damages awarded by the jury," a nuance that the trial court had discussed with them during a courtesy visit to the jury room following the verdict. Thereafter, the court disclosed its receipt of this letter to counsel for the parties, who at the time were still presenting evidence in the ancillary fee appeal.

After reviewing the juror's letter, the plaintiff's coun-

sel went to the courthouse clerk's office and, "for the first time," inspected the jury's initial verdict form and interrogatories. It was only then that the plaintiff's counsel became aware of the contents of the jury's initial verdict form and interrogatories, in which its answers to interrogatories did not state that the defendant's proven breaches of fiduciary duty had caused the plaintiff any proven damages, but did state that the plaintiff was entitled to recover punitive damages for such proven breaches based upon the wilful, wanton, or reckless manner in which the defendant had engaged in the wrongful conduct by which he had committed such breaches. The initial verdict form was signed and dated in accordance with the court's instructions, but the accompanying interrogatories were not.

The problem that the court had identified while reviewing the jury's answers to the initial interrogatories that it had submitted, along with its initial verdict form, arose from an apparent inconsistency between the jury's answers to the first and second portions of interrogatory number five. The first part of interrogatory number five asked the jury: "Did [the] plaintiff prove that the estate suffered any damages or losses as a result of the defendant's breach(es) of fiduciary duty?" The jury answered, "Yes," to that question. Below that answer was a table listing all of the ways in which the plaintiff claimed at trial that the defendant had breached his fiduciary duties. The jury was instructed, in interrogatory number five itself, that if it had answered, "Yes," to the initial damages question, it was to fill out the accompanying table by recording its findings as to particular sums of damages, if any, that the defendant had caused the plaintiff to suffer as a result of each alleged breach of fiduciary duty which the plaintiff had proven. The written instruction directed the jury, more particularly, to "leave blank . . . any claimed breach you do not find to have been proven or for which no damages were proven . . . ." The jury left the entire table blank, leaving open the question, resulting from the inherent ambiguity in the written instruction, whether the blanks it had left on the table in interrogatory number five signified that the particular breaches of fiduciary duty which it had found proven by its answers to interrogatory number four[21] had caused the plaintiff to suffer no damage at all, in which case they could not support a finding of liability, or that those proven breaches of fiduciary duty had caused the plaintiff some damage which the jury found itself unable to quantify. Notwithstanding this lack of clarity, the jury appears to have moved on, after leaving blanks on the table in interrogatory number five, by answering the questions concerning the plaintiff's claim for punitive damages for breach of fiduciary duty in interrogatory numbers six and seven. Interrogatory number six asked: "Did [the] plaintiff prove that [the] defendant's wrongful conduct relating to breach of fidu-

ciary duty was outrageous and showed a reckless indifference to the rights of others or an intentional and wanton violation of those rights?"; interrogatory number six also asked: "Did [the] plaintiff prove that she is entitled to recover punitive damages for such reckless conduct?" The jury answered, "Yes," to both questions in that interrogatory, and answered, "Yes," to that portion of the initial plaintiff's verdict form as to whether the plaintiff was entitled to recover punitive damages from the defendant. It cannot be determined from the record what other answers the jury may have recorded on the initial interrogatories when it attempted to return its initial verdict because the trial court did not discuss such matters on the record at that time, and further, no copies of the initial verdict form and interrogatories were made before they were sent back into the jury room for the continuation of deliberations. It is clear from the very last page of the initial interrogatories, however, that the jury did not complete those interrogatories in accordance with the court's instructions, for the signature and date lines were left blank by the jury foreperson.

On April 21, 2015, the plaintiff informed the court and the defendant that she intended to file two motions to set aside the verdict; the first motion to address the verdict and supplemental instructions, and the second to address the court's evidentiary rulings in the malpractice action. By agreement of all parties, the court extended the deadline to file postverdict motions until April 30, 2015, and stated its intent to hear both motions at the same time. On May 28, 2015, the trial court conducted a posttrial hearing on the plaintiff's postverdict motions.

At that hearing, the defendant argued that the jury's initial verdict was not valid because its verdict forms and interrogatories contained missing answers, inconsistent answers, and the interrogatories were not signed; on that basis, the defendant argued that the court could not have accepted the jury's initial verdict pursuant to Practice Book §§ 16-18[22] or 16-31.[23] As for the plaintiff's claims of error with respect to the court's supplemental instructions, the defendant argued that "without an objection to any of those charges . . . the plaintiff [cannot] complain about what the court told the jury. . . . The time to object was when the jury was being charged." Last, with respect to the juror's postverdict letter, the defendant argued that, pursuant to Practice Book § 16-34,[24] the court could not consider that letter as a basis for setting aside the verdict.

The plaintiff responded that she could not have objected or excepted to the court's supplemental instructions on any of the grounds raised in her first motion to set aside the verdict because she did not learn of the errors in them until after being notified of the juror's letter, which prompted her to inspect the

jury's initial verdict form and interrogatories. Thus, although the plaintiff's counsel conceded that "[he] did not object to the court's instruction," he argued that "you [cannot] waive what you don't know. And I didn't know about the verdict form." As to the merits of her claims of instructional error, the plaintiff asserted that the court's supplemental jury instructions "contained palpable errors," especially in light of the fact that the jury, in its initial verdict, had "rendered a full and complete verdict on the question of liability," and that the juror's letter corroborated the plaintiff's claim of prejudice.

Thereafter, on June 30, 2015, the court issued separate rulings denying the plaintiff's motions to set aside the verdict. As for the first motion to set aside the verdict, the court found that: "[i]n its initial response [to the jury's first attempted verdict] . . . the court instructed the jury that a verdict for [the] plaintiff required nonzero damages and further advised the jury that it could award nominal damages." With respect to the jury's second note, the court attempted to address those questions "focusing on the need for [the] plaintiff to prove damages with reasonable certainty as part of her burden of proof a cause of action." The court further stated that it had referred only to the elements of liability "to put the issue in context—to prevail, [the] plaintiff was required to prove all elements of her cause of action." In addressing the plaintiff's argument that she was unaware that a plaintiff's verdict had been returned, the court stated that such a position was "not a fair assessment of the situation. The jury reported that it had reached a verdict; the court made it clear that it could not accept responses that [the] plaintiff had proven damages arising from tortious conduct but that did not include any nonzero award of damage[s]. After the jury had been excused, the court referred to its recollection of appellate decisions relating to a verdict for a plaintiff with zero damages. None of this would have made any sense but for the jury having found for [the] plaintiff on liability but without a nonzero award of damages. . . . *If* [the] plaintiff truly had been unclear, either after the court's initial reinstruction of the jury or after its response to the follow-up question, it would have been a simple matter to ask.

"As to the issue of punitive damages, the court does not believe it would have been appropriate to address punitive damages in the absence of a proper verdict for [the] plaintiff or a question from the jury. The jury had copies of the court's entire charge, and there was no perceived need to instruct on an area for which there was no question or obvious need for curative action." (Emphasis in original.) On those grounds, the court denied the plaintiff's first motion to set aside the verdict.

A

Valid Verdict

On appeal, the plaintiff reasserts her claim that the court erred in declining to accept the jury's initial verdict. In support of that claim, the plaintiff argues that the jury "unequivocally and unanimously found for the plaintiff and indicated that [the] plaintiff should be awarded punitive damages. . . . The only thing missing from the form was an amount of economic damages." In support of her argument, the plaintiff cites our Supreme Court's ruling in *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 761 A.2d 1268 (2010) (*Hi-Ho Tower*), for the proposition that "the jury's award of punitive damages proved the element of actual damages." The plaintiff thus argues that, because "the verdict was technically correct with respect to punitive damages," the court should have accepted the verdict pursuant to Practice Book § 16-31.[25] For all of these reasons, the plaintiff further argues that the trial court abused its discretion in denying her first motion to set aside the verdict.

The defendant counters that the court properly declined to accept the jury's initial verdict because the accompanying interrogatories were "unsigned, incomplete, and inconsistent and the verdict [based upon them] was not in order or technically correct." The defendant further asserts that "damages were an essential element of the plaintiff's cause of action," and thus the initial verdict could not have been accepted by the court because "[i]t is inherently inconsistent to state that a plaintiff has prevailed in proving a cause of action while simultaneously stating that the plaintiff has not proven an element of the cause of action." The defendant also asserts that there is no support for the plaintiff's assertion that the court should have instructed the jury simply to enter an award of punitive damages. We agree with the defendant.

We begin with our standard of review. "The proper appellate standard of review when considering the action of a trial court in granting or denying a motion to set aside a verdict is the abuse of discretion standard. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done. . . . [T]he role of the trial court on a motion to set aside the jury's verdict is not to sit as [an added] juror . . . but, rather, to decide whether, viewing the evidence in the light most favorable to the prevailing party, the jury could reasonably have reached the verdict that it did. . . . In reviewing the action of the trial court in denying [or granting a motion] . . . to set aside the verdict, our primary concern is to determine whether the court abused its discretion . . . ." (Citations omitted; internal quotation marks omitted.) *Hall* v. *Bergman*, 296 Conn. 169, 179, 994 A.2d 666 (2010).

"[P]ursuant to General Statutes § 52-223, [t]he court may, if it judges the jury has mistaken the evidence in the action and has brought in a verdict contrary to the evidence, or has brought in a verdict contrary to the direction of the court in a matter of law, return them to a second consideration, and for the same reason may return them to a third consideration. The jury shall not be returned for further consideration after a third consideration. See also Practice Book § 16-17. This statute . . . does not limit the power of the trial court to return the jury to a second or third consideration, to cases in which the verdict is, in the opinion of the court, in favor of or against a wrong party. A verdict in other respects correct may be contrary to the evidence, or to the direction of the court in a matter of law, because [it is] for too large or too small a sum, and the provisions of this section are applicable to such cases." (Internal quotation marks omitted.) *Mazier* v. *Signature Pools, Inc.*, 159 Conn. App. 12, 41, 123 A.3d 1, cert. denied, 319 Conn. 933, 125 A.3d 207 (2015).

A trial court may decline to accept a verdict and return the jury to continue its deliberations when the verdict form or accompanying interrogatories, if any: are legally inconsistent; e.g., *Bilodeau* v. *Bristol*, 38 Conn. App. 447, 455, 661 A.2d 1049 ("[w]here answers to interrogatories are inconsistent, the trial court has the duty to attempt to harmonize the answers"), cert. denied, 235 Conn. 906, 665 A.2d 899 (1995); contain incomplete findings as to the essential elements of a cause of action or fail to completely dispose of an essential issue; e.g., *Tisdale* v. *Riverside Cemetery Assn.*, 78 Conn. App. 250, 258–60, 826 A.2d 232, cert. denied, 266 Conn. 909, 832 A.2d 74 (2003); or are so ambiguous that the verdict cannot be said to contain an intelligible finding; see, e.g., id., see also *Sigular* v. *Gilson*, 141 Conn. App. 581, 587, 62 A.3d 564 ("A verdict is not defective as a matter of law as long as it contains an intelligible finding so that its meaning is clear. . . . A verdict will be deemed intelligible if it clearly manifests the intent of the jury." [Internal quotation marks omitted.]), cert. granted, 308 Conn. 948, 67 A.3d 291 (2013) (appeal withdrawn August 1, 2013).

After reviewing the jury's initial verdict form and accompanying interrogatories, we agree with the defendant that the jury's failure to award damages rendered the initial verdict ambiguous as first presented, and thus that the trial court acted well within its discretion by not accepting that verdict and returning the jury to continue its deliberations.[26]

In order to constitute a complete verdict, the jury's verdict form, and where applicable, its accompanying interrogatories, must contain legally consistent findings as to all essential elements of the plaintiff's cause of action. Cf. *Right* v. *Breen*, 277 Conn. 364, 377, 890 A.2d 1287 (2006) ("[w]ithout proof of each of [the elements

of a cause of action], a plaintiff's cause fails entirely, and he is not entitled to have the question of damages considered"); see also *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 577, 479 A.2d 781 (1984) (holding that "in civil cases when a verdict rests upon a factual finding contradictory to another finding of the same issue by the trier the judgment cannot stand"); *Arnold* v. *Moriarty*, 140 Conn. App. 872, 880, 60 A.3d 317 (2013) (holding that "it is not unreasonable for a jury to determine that a plaintiff has proved some elements of his or her cause of action without proving them all . . . and in such a situation a defendant's verdict is proper" [citation omitted]).

In this case, the plaintiff argues that the jury's initial verdict was complete with respect to her claim of breach of fiduciary duty, and thus that the court should have accepted that verdict. As discussed in the preceding paragraphs, the plaintiff cites *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, supra, 255 Conn. 20, for the proposition that "the jury's award of punitive damages proved the element of actual damages" and, therefore, the jury's initial verdict in this case contained legally consistent findings as to each of the essential elements of the plaintiff's claim of breach of fiduciary duty. We disagree.

In *Hi-Ho Tower*, the plaintiff communications business sought damages from the defendants "for the defendants' alleged unlawful use of the plaintiff's radio and communications tower." *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, supra, 255 Conn. 22. The defendant, Com-Tronics, Inc. (Com-Tronics), and its principal, filed a four count counterclaim. Id. Thereafter, the jury found in favor of the defendants "on all . . . counts of the complaint, and for Com-Tronics on the third count of its counterclaim, which was based on the theory of tortious interference with business expectancies." Id. In connection with Com-Tronics' claim of tortious interference, "the court bifurcated the question of punitive damages. After the jury rendered a verdict for Com-Tronics . . . but awarded damages of $0, the trial court, over the objection of the plaintiff, submitted the question of punitive damage to the jury with supplementary instructions. The jury then rendered a verdict of $120,000 in punitive damages." Id., 26. On appeal, the plaintiff in *Hi-Ho Tower* claimed that the court "improperly denied [its] motion for a directed verdict . . . because Com-Tronics failed to prove actual loss and recovered punitive damages in the absence of an award of compensatory damages." Id. Our Supreme Court disagreed.

The court in *Hi-Ho Tower* first agreed that, in order to establish a claim of tortious interference with business expectancies, a complainant must prove that "as a result of the [tortfeasor's] interference, the plaintiff suffer[ed] actual loss." Id., 27. In discussing the element of actual loss, the court noted that "[a] major problem

with damages of this sort . . . is whether they can be proved with a reasonable degree of certainty. . . . If the question is whether the plaintiff would have succeeded in attaining a prospective business transaction in the absence of [the] defendant's interference, the court may . . . give due weight to the fact that the question was made hypothetical by the very wrong of the defendant. . . . Thus, an award of compensatory damages is not necessary to establish a cause of action for tortious interference *as long as there is a finding of actual loss, and a finding of actual loss may support an award of punitive damages*." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 34.

The court in *Hi-Ho Tower* then analyzed the jury's interrogatories and the trial court's supplemental jury instructions. In so doing, the court first noted that the jury's interrogatories contained findings that the plaintiff had tortiously interfered with Com-Tronics' business expectancies; that Com-Tronics had proved zero dollars in damages as a result of such tortious interference; and that Com-Tronics had proved that it was entitled to recover punitive damages. Id., 34–35. It also noted that, after receiving these interrogatories, the trial court provided the following supplemental instructions: "punitive damages may lie if you have found Com-Tronics suffered actual loss, *even though it may not be proven to you the dollar amount of damages with the required degree of certainty* [*by a*] *preponderance of the evidence. If your zero damage in Question 9 was intended to indicate that you believe there was no loss, calculable or not, that was shown to have been suffered at all, then when you state a punitive amount, it ought to be zero, because some actual loss, even if not calculable*, is an element of tortious interference . . . ." (Emphasis in original; internal quotation marks omitted.) Id., 36. Following that additional instruction, "[t]he jury returned with a punitive damages award of $120,000." Id., 37.

In affirming the trial court's denial of the plaintiff's motion for a directed verdict in *Hi-Ho Tower*, our Supreme Court held that "the jury was explicitly instructed that, if it did not find that Com-Tronics had suffered an actual loss, it should not award any punitive damages, but that if it found that Com-Tronics had suffered some actual loss, even if not calculable, it should award punitive damages. . . . In light of the specific jury interrogatories and answers, we conclude that the jury found that Com-Tronics had suffered some actual loss, although its specific amount had not been proven. Accordingly, we give due weight to the fact that the [specific amount of the loss] was made hypothetical by the very wrong of the defendant. . . . Because the jury found that actual loss had been proven, the fact that Com-Tronics did not prove by a preponderance of the evidence the specific amount of the loss

should not bar recovery of punitive damages in this case." (Citations omitted; internal quotation marks omitted.) Id.

In the present case, the plaintiff argues that the jury's initial verdict and accompanying interrogatories were substantially similar to those interrogatories returned in *Hi-Ho Tower* and thus the court should have accepted the initial verdict as a complete and consistent verdict on the plaintiff's claim of breach of fiduciary duty. Although we find *Hi-Ho Tower* to be instructive in our analysis, we conclude that the rationale of that case supports, rather than undermines, the propriety of the trial court's actions in this case.

As a preliminary matter, we note that the plaintiff in this case had the burden of establishing four essential elements with respect to her claim of breach of fiduciary duty: "[1] [t]hat a fiduciary relationship existed which gave rise to . . . a duty of loyalty . . . an obligation . . . to act in the best interests of the plaintiff, and . . . an obligation . . . to act in good faith in any matter relating to the plaintiff; [2] [t]hat the defendant advanced his or her own interests to the detriment of the plaintiff; [3] [t]*hat the plaintiff sustained damages*; [and] [4] [t]hat the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty." (Emphasis added.) T. Merritt, 16 Connecticut Practice Series: Elements of an Action (2016–2017 Ed.) § 8:1, p. 686; see also *Bozelko* v. *Papastavros*, 323 Conn. 275, 283 n.10, 147 A.3d 1023 (2016). As for the plaintiff's claim for punitive damages, it is well established that "a demand for punitive damages is not a freestanding claim; rather, it is parasitic and possesses no viability absent its attachment to a substantive cause of action." (Internal quotation marks omitted.) *Gallinari* v. *Kloth*, 148 F. Supp. 3d 202, 217 (D. Conn. 2015); see also *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 97 Conn. App. 541, 577, 905 A.2d 1214 ("[p]unitive damages are a *remedy* awarded only when the evidence shows reckless, intentional or wanton violation of the rights of others" [emphasis added; internal quotation marks omitted]), cert. denied, 280 Conn. 943, 912 A.2d 479 (2006).

Accordingly, before the jury in this case could consider whether to award the plaintiff punitive damages for breach of fiduciary duty, it was required to find that the plaintiff had established the defendant's liability for breach of fiduciary duty. The court's analysis in *Hi-Ho Tower* does not run counter to this proposition. Indeed, the court in *Hi-Ho Tower* expressly approved of the trial court's supplemental instructions, wherein it reinstructed the jury that, if its finding of zero dollars in damages "was intended to indicate that you believe there was no loss, calculable or not, that was shown to have been suffered at all, then when you state a punitive amount, it ought to be zero, *because some*

*actual loss, even if not calculable, is an element of tortious interference . . . .*" (Emphasis altered.) *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, supra, 255 Conn. 36; see also *Froom Development Corp.* v. *Developers Realty, Inc.*, 114 Conn. App. 618, 638, 972 A.2d 239 ("Regardless of whether there was sufficient evidence to support the jury's finding that the trust did not breach the fiduciary duty owed to the plaintiffs . . . the defendants would still prevail on the count alleging a breach of fiduciary duty. Even if we were to assume there was a breach, a defendants' verdict on this count is supported by the evidence because there was sufficient evidence to support the jury's finding that any breach did not cause any injury."), cert. denied, 293 Conn. 922, 980 A.2d 909 (2009).

We have held previously that "[a] plaintiff's verdict with a nominal damage award ordinarily suggests that the jury found that despite the defendant's liability, the plaintiff failed to prove damages. . . . [T]he jury's intent in rendering a plaintiff's verdict with zero damages . . . is far less clear. . . . In this situation, it cannot be stated with certainty either that the jury found that the plaintiff had failed to prove any damages or that the jury was confused as to the correct interplay between damages and liability." (Internal quotation marks omitted.) *Froom Development Corp.* v. *Developers Realty, Inc.*, supra, 114 Conn. App. 633. Here, however, the jury's interrogatories contained neither a nominal, nor substantial, nor a zero dollar award of damages. Although the jury in this case responded, "Yes," to interrogatory number five: "Did [the] plaintiff prove that the estate suffered any damages as a result of the defendant's breach(es) of fiduciary duty?"; it left blank the accompanying table wherein the jury was instructed to list the particular amounts of damages that she had suffered as a result of the defendant's proven breaches. Thus, much like the trial court in *Hi-Ho Tower*, the court in this case was presented with interrogatories that reasonably could have been interpreted in either of two ways: that the plaintiff had proved harm, but the amount of damages was not quantifiable, or that the plaintiff had failed to prove that she was harmed at all, resulting in a failure of proof as to the defendant's liability on the basis of such breaches. Faced with these two reasonable interpretations as to what the jury intended by leaving blank the table in interrogatory number five, the court had the power to return the jury with the instruction to continue its deliberations on the issue of liability and clarify its initial verdict. See Practice Book §§ 16-17 and 16-18. In a reasonable exercise of its authority, the trial court attempted to clarify the jurors' intent—much like the trial court in *Hi-Ho Tower*—by reinstructing them, inter alia, that "if you're saying damages would actually exist then it should be something more than zero; it could be a dollar, it could be ten dollars, it could be a hundred

dollars. Nominal. Either it should be no damages proved or damages were proved but a nonzero amount."

In these circumstances, we agree with the defendant that, until the court resolved the potential inconsistency of returning a plaintiff's verdict for breach of fiduciary duty without first finding that the defendant, by one or more of his proven breaches, had caused the plaintiff some harm, the initial verdict and interrogatories were ambiguous, and thus could not have been accepted pursuant to Practice Book § 16-31.[27] See, e.g., *Tezack* v. *Fishman & Sons, Inc.*, 173 Conn. 183, 187–89, 377 A.2d 272 (1977).

We further agree with the defendant that once the jury had returned to continue its deliberations, it had the power to change its initial plaintiff's verdict to a defendant's verdict on all counts. See *Van Nesse* v. *Tomaszewski*, 265 Conn. 627, 635, 829 A.2d 836 (2003) ("until the jury rendered a verdict that the court accepted, the jury was free to change its award regarding the award of noneconomic damages"); see also *Towhill* v. *Kane*, 147 Conn. 191, 194, 158 A.2d 251 (1960) (rejecting the claim that "that the jury, upon reconsideration, were powerless to change their verdicts on the issue of liability"). When the jury returned its final verdict, which was complete and legally consistent in all material respects, and thereafter, orally confirmed for the court that that was indeed their true and unanimous verdict, the court was required to accept that verdict under Practice Book § 16-31. *Szlinsky* v. *Denhup*, 156 Conn. 159, 164, 239 A.2d 505 (1968) ("[i]f a verdict in the proper form is returned by the jury after the jury's second reconsideration, it must be accepted by the court"), citing *State* v. *Searles*, 113 Conn. 247, 256, 155 A. 213 (1931). That, of course, is what the trial court did. Accordingly, we conclude that the trial court did not abuse its discretion in declining to accept the jury's initial verdict and instead returning the jury to continue its deliberations.

B

Supplemental Instructions

The plaintiff next claims that the court's supplemental jury instructions were erroneous because, inter alia, the court: (1) deviated from the language in its original jury charge; (2) conflated the elements of liability with its instructions on damages; and (3) told the jury to " 'start from scratch,' " even though the jury had already determined the issue of liability. The plaintiff maintains that she was unable to take meaningful exception to the court's proposed charges before or after the court's supplemental instructions because she was never informed either that the plaintiff's verdict form contained findings awarding her punitive damages or that the jury's interrogatories indicated that the jury had found that she was entitled to such damages. She

argues, therefore, that the court's failure to communicate this information "impacted the actions taken by [the] plaintiff's counsel and [was] reflected in counsel's silence and failure to object to subsequent proceedings and instructions by the court." The plaintiff thus argues that these claims were adequately preserved when she presented her first motion to set aside the verdict.

The defendant responds that the plaintiff's claims of instructional error are not reviewable on appeal because they were not properly preserved at trial. This is so, the defendant argues, because the plaintiff "raised no objection to any of [the] instructions" she now challenges on appeal until she filed her first motion to set aside the verdict. The defendant argues that the plaintiff was aware that the jury had reportedly reached a verdict and that there were inconsistencies within the interrogatories. At no point, however, did the plaintiff request to see the interrogatories or attempt to clarify whether there were other inconsistencies in the interrogatories. The defendant thus argues, under Practice Book § 16-20 and applicable case law, that the plaintiff's failure to take exception to the court's proposed instructions until after the jury had already returned a valid defendant's verdict should preclude the plaintiff from challenging those instructions on appeal. We agree with the defendant.

Pursuant to Practice Book § 60-5: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. . . ." "As we have repeatedly reiterated, issues not properly raised before the trial court will ordinarily not be considered on appeal. . . . We have referred to the policy reasons underlying the preservation requirement on several occasions. The policy serves, in general, to eliminate the possibility that: (1) claims of error would be predicated on matters never called to the attention of the trial court and upon which it necessarily could have made no ruling in the true sense of the word; and (2) the appellee . . . would be lured into a course of conduct at the trial which it might have altered if it had any inkling that the [appellant] would . . . claim that such a course of conduct involved rulings which were erroneous and prejudicial to him." (Citation omitted; internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 48, 717 A.2d 77 (1998), citing *Skrzypiec* v. *Noonan*, 228 Conn. 1, 13, 633 A.2d 716 (1993).

With respect to claims of instructional error, Practice Book § 16-20 provides in relevant part: "An appellate court shall not be bound to consider error as to the giving of, or the failure to give, an instruction unless the matter is covered by a written request to charge or exception has been taken by the party appealing immediately after the charge is delivered. Counsel taking the exception shall state distinctly the matter

objected to and the ground of objection. . . ." Thus, in order "[t]o preserve an exception to a jury instruction for further review under Practice Book § 16-20, a party must either submit a written request to charge or *state distinctly* the matter objected to and the ground of objection. . . . It is our long-standing position that [t]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Socci* v. *Pasiak*, 137 Conn. App. 562, 572, 49 A.3d 287, cert. denied, 307 Conn. 919, 54 A.3d 563 (2012). "The purpose of the rule is to alert the court to any claims of error while there is still an opportunity for correction in order to avoid the economic waste and increased court congestion caused by unnecessary retrials." (Internal quotation marks omitted.) *Pestey* v. *Cushman*, 259 Conn. 345, 373, 788 A.2d 496 (2002).

After reviewing our case law and considering the policies underlying Practice Book § 16-20, we conclude that the plaintiff failed to adequately preserve this issue for our review. We are also cognizant that, at the time the court provided its supplemental jury instructions, the plaintiff had at her disposal several procedural safeguards that, if utilized, could have revealed the contents of the jury's initial verdict and interrogatories, including its answers to interrogatories concerning her claim for punitive damages on the claim of breach of fiduciary duty. To begin with, plaintiff's counsel was present when the court, upon receiving the jury's first note, marked as court exhibit 18, announced that the jury was reporting that it had reached a verdict. The word "verdict" was repeated thereafter on several occasions when the court addressed the jury about the problems with its initial verdict and interrogatories, clearly putting counsel on notice that the jury was about to return a plaintiff's verdict that might include findings as to her right to recover punitive damages. Moreover, after giving the jury supplemental instructions on the principles of nominal damages, the court stated to counsel, outside the presence of the jury: "I mean, technically I could accept zeros and the appellate courts have said that they are not going to reverse if you have a *plaintiff's verdict of zero* . . . but I'm not going to get into that as long as I've spotted it early enough." (Emphasis added.) At no point, however, did the plaintiff request to have the verdict and interrogatories read aloud prior to discussing the court's proposed supplemental instructions.[28] See, e.g., *Intelisano* v. *Greenwell*, 155 Conn. 436, 450, 232 A.2d 490 (1967); *Gillette* v. *Schroeder*, 133 Conn. 682, 685, 54 A.2d 498 (1947). Similarly, the plaintiff neither requested to review the interrogatories nor did she inquire on the record as to whether the verdict form contained findings as to punitive damages prior to assenting to the court's proposed supplemental instructions. See, e.g., *Towhill* v. *Kane*,

supra, 147 Conn. 193–94. Finally, after waiving the second reading of the verdict and interrogatories, the plaintiff declined the court's invitation to have the jury polled.

At oral argument before this court, the plaintiff was unable to articulate why she did not ask the trial court if she could inspect the jury's initial interrogatories. Had she done so, she would have learned of the jury's answers to those interrogatories regarding punitive damages and, thereafter, could have taken exception to the court's supplemental instructions while there was a meaningful opportunity for the court to rule on the issues. She failed to do so. Accordingly, she has not adequately preserved this issue for our consideration.

## II

We finally address the plaintiff's claims of error in the exclusion of evidence at trial, as initially raised at trial and later renewed in the plaintiff's second motion to set aside the verdict. The plaintiff first claims that the court abused its discretion in declining to admit her exhibit 88 as a full exhibit because it was "central to [the] plaintiff's proof." The plaintiff asserts that exhibit 88 would have served four substantive purposes: (1) it would have demonstrated that the defendant breached his fiduciary duties by failing to keep contemporaneous time records of the work he performed as both executor of and attorney for the estate; (2) it would have served as a "powerful tool of impeachment" during the defendant's examination by the plaintiff, and thus would have provided the jury with additional evidence as to the defendant's lack of credibility; (3) it would have enabled the plaintiff "to more fully prove [the defendant's] wanton and reckless conduct"; and (4) it would have been "another source by which [the jury could] glean information to determine proper damages to award to the plaintiff."[29] The plaintiff argues that the court abused its discretion in declining to admit exhibit 88 into evidence, created "an impassible burden for the plaintiff to prove her claims," and "[t]hus it is clear that [the] plaintiff was prejudiced . . . as it related to [the] plaintiff's ability to prove essential elements of her claims . . . ." For the same reasons, the plaintiff also claims that the trial court abused its discretion in denying her second motion to set aside the verdict. In the alternative, the plaintiff argues that the court abused its discretion in denying her second motion to set aside the verdict because the court's written order failed to address several arguments advanced in the plaintiff's accompanying memorandum of law in support of her second motion to set aside the verdict.

The defendant responds that exhibit 88 was not relevant to the plaintiff's allegations in the malpractice action, and thus the court's refusal to admit it did not constitute an abuse of discretion for three reasons. First, the plaintiff's second amended complaint, the

operative pleading in the malpractice action, failed to allege that the *amount* of the fees claimed by the defendant, by itself, constituted any basis for establishing either legal malpractice or a breach of fiduciary duty. Second, to the extent that exhibit 88 could be considered probative of the allegations actually asserted within the operative complaint, those allegations, if proven, would constitute neither a breach of fiduciary duty nor legal malpractice, and thus exhibit 88 was not probative on any material issue. Last, the probative value of such evidence, if any, would have been substantially outweighed by its prejudicial effect. In the alternative, the defendant argues that the court's failure to admit such evidence in the jury trial was harmless error. With regard to the court's denial of the plaintiff's second motion to set aside the verdict, the defendant asserts that, contrary to the plaintiff's argument, the trial court "thoroughly evaluated the substantive arguments raised in both the second motion to set aside and the defendant's objection to it, and addressed all of those . . . arguments in its . . . decision."

After thoroughly reviewing the record, we conclude that the trial court did not abuse its discretion in not admitting exhibit 88 into evidence during the malpractice action and that, in any event, the plaintiff failed to establish harmful error. Because we conclude that the court did not abuse its discretion in excluding such evidence from the malpractice action, we further conclude that the trial court did not abuse its discretion in denying the plaintiff's second motion to set aside the verdict. See *Buchanan* v. *Moreno*, 117 Conn. App. 732, 736–37, 980 A.2d 358 (2009).

The following additional facts are necessary for our resolution of this claim. In the operative complaint, the plaintiff alleged that the defendant breached his fiduciary duty to the estate in fourteen different ways, including, inter alia, his failure to keep accurate time records as to the work he performed as executor of and the attorney for the estate.

During the malpractice action, the plaintiff attempted on many occasions to introduce exhibit 88, a document marked for identification, as a full exhibit. On one such occasion, the plaintiff attempted to introduce exhibit 88 during the examination of Mary Patricia Wilson, a paralegal employed by the defendant to work on the administration of the estate. The plaintiff sought to use exhibit 88 in connection with her testimony as to the defendant's billing practices. After lengthy discussion, the court found that there was no evidence that exhibit 88 had ever been submitted to the plaintiff as a contemporaneous bill, but permitted the plaintiff to ask Wilson the limited question of how the Rendahl estate was billed, to which she replied, "I believe it was on a set fee."

During her examination of the defendant, the plaintiff

inquired as to whether he kept time and billing records in connection with his work for the estate. The defendant responded, "I kept some records, not complete records." The plaintiff did not attempt to impeach the defendant with the contents of exhibit 88 at that time. The following day, the plaintiff resumed her questioning of the defendant with regard to his billing practices. Specifically, the plaintiff questioned the defendant as to whether he "attach[ed] an hourly value to the time expended by Mary Patricia Wilson." The defendant objected on the grounds of relevance, and the court instructed the plaintiff "to ask a different question that focuses on the claim that's proper." Thereafter, the following exchange occurred:

"[The Plaintiff's Counsel]: In the administration of this estate did you assign an hourly value to the work performed by Mary [Patricia] Wilson?

"[The Defendant]: I did the estate on a basis of 2.5 percent.

"The Court: The question—the question is not what you actually billed. The question is whether you assigned a value to her work on an hourly basis at some point?

"[The Defendant]: I would say yes. Yes.

"[The Plaintiff's Counsel]: Okay, and what was the hourly value that you assigned to the work performed by Ms. Wilson in this estate?

"[The Defendant's Counsel]: Objection to relevance.

"The Court: I'll allow it. You can answer the question, please.

"[The Defendant]: I—I did not charge on the basis of—

"The Court: Okay, the question is not charging, the question is what is the value you assigned?

"[The Defendant]: Okay, she's a lawyer. It's—about— I think it's $350 an hour.

"(Pause)

"[The Plaintiff's Counsel]: If I could just have a moment, if Your Honor please?"

"(Pause)

"[The Plaintiff's Counsel]: No further questions. Thank you, very much."

At the close of evidence, counsel presented closing arguments to the jury and thereafter, the jury was instructed on the law. See part I of this opinion. In its final verdict, the jury indicated that it had found unanimously in favor of the defendant on all counts. In the second set of interrogatories accompanying that verdict, the jury answered, "No," to interrogatory number one: "Did [the] plaintiff prove that any claimed

breach of fiduciary duty was related to self-dealing, conflict of interest, or fraud (other than receipt of reasonable fees)?" Interrogatory number one instructed the jury that, "if the answer is NO, go to interrogatory #4." The jury then answered, "No," to interrogatory number four: "Did [the] plaintiff prove by a preponderance of the evidence that [the] defendant Frank N. Peluso breached his fiduciary duty owed to the estate as executor in any or all of the following ways?"[30] Interrogatory number four instructed the jury as follows: "if the answer to all of them is NO, go to interrogatory #7." By answering, "No," to every instance of alleged misconduct in interrogatory number four, the jury was instructed not to consider whether the defendant's breach of duty proximately caused the plaintiff to suffer harm, how much damages were incurred, or whether the defendant acted with reckless indifference. Although, in the plaintiff's remaining count of legal malpractice, the jury answered, "Yes," to interrogatory number ten: "Did [the] plaintiff, in her capacity as the beneficiary of the estate of Frances Rendahl, prove that her relationship with the defendants . . . was the functional equivalent of an attorney-client relationship, for purposes of establishing the existence of a duty to her?", the jury found against the plaintiff on each of the remaining interrogatories, and thus returned a verdict in favor of the defendant on all counts. With these additional facts in mind, we turn now to the substance of the plaintiff's claims.

Our standard of review is well established. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . Moreover, evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . Furthermore, [b]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result. . . . When judging the likely effect of such a trial court ruling, the reviewing court is constrained to make its determination on the basis of the printed record before it. . . . In the absence of a showing that the [excluded] evidence would have affected the final result, its exclusion is harmless." (Citation omitted; internal quotation marks omitted.) *Desrosiers* v. *Henne*, 283 Conn. 361, 365–66, 926 A.2d 1024 (2007). Where an appellant further alleges that, as a result of the trial court's improper evidentiary rulings,

the court abused its discretion in denying a motion to set aside the verdict, "[w]e treat [that] claim the same as the defendants' claim of evidential impropriety." *Buchanan* v. *Moreno*, supra, 117 Conn. App. 736–37.

A

We first dispose of the plaintiff's claim that the court should have admitted exhibit 88 into evidence as "a powerful tool of impeachment" that "would have eliminated any and all credibility afforded by the jury to the defendant's testimony." "[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . [A] party cannot present a case to the trial court on one theory and then seek appellate relief on a different one . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Santana*, 313 Conn. 461, 466–67, 97 A.3d 963 (2014); see also *Grody* v. *Tulin*, 170 Conn. 443, 448, 365 A.2d 1076 (1976) ("a party is not entitled to raise issues on appeal which have not been raised in the trial court").

On appeal, the plaintiff claims that the court abused its discretion in not admitting exhibit 88 into evidence because the plaintiff could have used such evidence to impeach the defendant, thereby "[highlighting] the defendant's low regard for accuracy or truthfulness." The plaintiff, however, failed to assert this theory during her examination of the defendant.[31] Accordingly, we decline to address the plaintiff's claim that the court abused its discretion in declining to admit exhibit 88 for this purpose. See *State* v. *Santana*, supra, 313 Conn. 468 ("although a party need not use the term of art applicable to the claim, or cite to a particular statutory provision or rule of practice to functionally preserve a claim, he or she must have argued the underlying principles or rules at the trial court level in order to obtain appellate review.").

We turn now to the plaintiff's remaining claims that exhibit 88 (1) would have demonstrated the defendant's breach of fiduciary duty for failing to maintain time records; (2) would have more fully established the defendant's wanton and reckless conduct; and (3) would have provided the jury with additional evidence of the damages caused by the defendant's misconduct. We conclude that exhibit 88 was not probative as to whether the defendant breached his fiduciary duty to the estate under the facts of this case, and thus the exclusion of such evidence did not amount to an abuse of discretion.

From the outset, we note that "[e]vidence is relevant when it has a logical tendency to aid the trier of fact in deciding an issue that is material to the determination of the proceeding." *State* v. *Smith*, 275 Conn. 205, 217, 881 A.2d 160 (2005); see also Conn. Code Evid. § 4-1.

Relevance "embodies two concepts, materiality, and relevancy or probative value." C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 4.1.2, p. 154. "The material issues are framed by the pleadings and are controlled by substantive law." Id., § 4.1.3.

Although we agree with the plaintiff that exhibit 88 was probative as to her allegation that the defendant failed to maintain adequate time records in connection with his work as executor of and attorney for the estate, we conclude that, because the defendant's compensation was a fixed percentage of the estate's value, his failure to keep time records did not constitute a breach of fiduciary duty in this case. See *Andrews* v. *Gorby*, 237 Conn. 12, 25, 675 A.2d 449 (1996) ("[A]n executor who also acts as the attorney for the estate is not precluded from reasonable attorney's fees solely because he failed to keep time records for his services"); cf. *Smith* v. *Snyder*, 267 Conn. 456, 483, 839 A.2d 589 (2004) ("[a]lthough the better practice is for an attorney . . . to maintain time records, the failure to do so does not preclude the court from determining and awarding an attorney's fee") (*Borden, J.*, concurring). Indeed, at oral argument before this court, the plaintiff admitted that her expert witness, Peter Mott, did not testify that a failure to keep contemporaneous time records while working on a fixed percentage fee constituted a breach of fiduciary duty; instead, he testified merely that it was better practice to keep such records to the extent that "it makes it [less] difficult later on to deal with [a potential] challenge" as to the amount of fees claimed.

Accordingly, to the extent that exhibit 88 was relevant as to the plaintiff's allegation that the defendant failed to maintain time records, we conclude that that allegation, even if established, would not constitute a breach of fiduciary duty under the facts of this case. As such, that allegation was not a material issue in the malpractice action, and thus its exclusion in the malpractice action was not an abuse of discretion. See *Desrosiers* v. *Henne*, supra, 283 Conn. 365–66. Because we conclude that the court did not abuse its discretion in not admitting exhibit 88 into evidence for that purpose, we further conclude that the court did not abuse its discretion in denying the plaintiff's second motion to set aside the verdict on that ground. See *Buchanan* v. *Moreno*, supra, 117 Conn. App. 736–37.

We also reject the plaintiff's claims that exhibit 88 would have provided evidence of the defendant's wanton and reckless misconduct, as well as evidence from which the jury could derive an amount of compensatory damages suffered. "It is well established that evidence as to the expressions and arguments of the jurors in their deliberations and evidence as to their own motives, beliefs, mistakes and mental operations generally, in arriving at their verdict is excludable in postverdict proceedings as immaterial. . . . That rule has been

aptly described as applying the parol evidence rule to a jury's verdict, so that [the jurors'] outward verdict as finally and formally made, and not their prior and private intentions, is taken as exclusively constituting the act." (Internal quotation marks omitted.) *Hall* v. *Bergman,* supra, 296 Conn. 179–80. In its final verdict, the jury in this case found that the plaintiff had failed to prove by a preponderance of the evidence that the defendant committed any breach of fiduciary duty.[32] Pursuant to the instructions within the interrogatories, the jury was instructed that, if it found no breach of fiduciary duty had occurred, it was to proceed past those questions regarding the amount of damages suffered or whether the defendant acted with reckless indifference. Accordingly, the jury did not consider and made no finding as to whether the plaintiff suffered harm or whether she was entitled to recover punitive damages. Without first reaching and making findings as to either of these factual predicates, we conclude that there is no basis to furnish the relief requested by the plaintiff. For the same reason, we further conclude that the trial court did not abuse its discretion in denying the plaintiff's first motion to set aside the verdict on these grounds.

B

Finally, we dismiss the plaintiff's remaining claim that, in denying her second motion to set aside the verdict, the trial court abused its discretion by not addressing the plaintiff's argument that exhibit 88 "would have proved additional elements of [the] plaintiff's complaint, and specifically that the defendant failed to maintain adequate time records."

We first note our agreement with the defendant that the trial court thoroughly considered and examined the legal arguments presented by the plaintiff in its order denying her second motion to set aside the verdict. Further, to the extent that the court did not expressly address her claim that exhibit 88 would have demonstrated a breach of fiduciary duty for failing to maintain adequate time records, the plaintiff failed to file a motion for articulation on this particular ground. "[W]e read an ambiguous record, in the absence of a motion for articulation, to support rather than undermine the judgment. . . . Because the [plaintiff] did not seek the trial court's articulation in that regard, we must assume [that] the [court] acted properly. . . . Absent an articulation regarding the legal basis for the trial court's decision, a claim of error cannot be predicated on the assumption that the trial court acted erroneously." (Citation omitted; internal quotation marks omitted.) *In re Kyara H.*, 147 Conn. App. 855, 871 n.11, 83 A.3d 1264, cert. denied, 311 Conn. 923, 86 A.3d 468 (2014); see *Ippolito* v. *Olympic Construction, LLC*, 163 Conn. App. 440, 451 n.6, 136 A.3d 653, cert. denied, 320 Conn. 934, 134 A.3d 623 (2016). Finally, as we have already

concluded in part II A of this opinion, that allegation, even if proven to be true, would not constitute a breach of fiduciary duty under the facts of this case. In light of the foregoing, we conclude that the trial court did not abuse its discretion in denying the plaintiff's second motion to set aside the verdict.

The judgment is affirmed.

In this opinion the other judges concurred.

* April 28, 2017, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] For reasons more fully explained throughout this opinion, the plaintiff vehemently disagreed with several components of this valuation.

[2] The other coexecutor of the estate, Scott Carroll Knauer, predeceased Frances M. Rendahl. Accordingly, the defendant was appointed as the sole executor of the estate.

[3] At trial, the plaintiff testified that she had never received this engagement letter and claimed that she was unaware of the mathematical basis for the defendant's fee. The defendant later testified that the plaintiff had not signed the engagement letter but maintained that he had disclosed his fees.

[4] Under the terms of her will, the testator expressed the desire to have the defendant occupy both roles of executor and attorney because "[the defendant's firm was] familiar with my estate, and they have in the past assisted me in legal matters."

[5] Testimony at trial revealed that, prior to her death, the decedent had inherited her brother's house in Florida. The plaintiff was named as the decedent's personal representative with respect to the Florida property. With the defendant's assistance, the plaintiff hired another attorney, Bruce Benenfeld, to oversee the ancillary probate proceedings in Florida concerning this property.

[6] This figure represented a home equity line of credit that the decedent had opened originally in 1990 to maintain her standard of living. Although the original line of credit was for only $39,000, the decedent continued to use that line of credit throughout the following sixteen years, resulting in a balance of $775,387.42 on the date of the decedent's death. By the date of the estate's 2007 inventory filing, that balance had been reduced to $749,834.

[7] As previously stated, the estate's reported gross value was approximately $3.083 million. From that number, the defendant subtracted $1.608 million in deductions, including, inter alia: $204,874 in funeral and probate expenses; the plaintiff's $536,914 personal loan to her mother; and $791,946 in mortgages, property taxes, and liens. Thus, the reported tentative taxable estate was approximately $1,475,451.

[8] Attorney Johnson testified that there was a "short period of time where Connecticut had a Cliff rate and estates [valued] in excess of two million dollars [paid] tax based on the full two million dollars." Thus, he explained, "if [you were] over two million dollars, you are going to pay tax on the full two million dollars" at a rate of "7.2 percent."

[9] The defendant claimed that he incurred these fees "in responding to the objections to the executor's final account by the sole beneficiary of the estate . . . ." *Peluso* v. *Probate Appeal*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-05-013414-S, 2012 WL 898753, *1 (*Hon. Alfred J. Jennings, Jr.*, judge trial referee).

[10] Although our analysis of the plaintiff's claim of improper evidentiary rulings implicates the fee appeal, as the fee appeal was tried simultaneously to the court alongside the malpractice action, we note that neither the merits of the fee appeal nor the merits of the removal appeal are before this court in the instant appeal.

[11] See footnote 10 of this opinion.

[12] See footnote 10 of this opinion.

[13] Practice Book § 16-31 states: "Subject to the provisions of Section 16-17, the judicial authority shall, if the verdict is in order and is technically correct, accept it without comment."

[14] Prior to trial, the defendant filed a motion to strike the plaintiff's third count of wilful, wanton and reckless misconduct, her fourth count of breach of contract, her fifth count of conversion, and her sixth count of civil theft. Thereafter, on June 5, 2013, the trial court, *Povodator, J.*, ordered that the fourth, fifth, and sixth counts be stricken, but denied the defendant's motion with respect to the third count of wilful, wanton and reckless misconduct.

Following the close of evidence, the defendant orally moved for a directed verdict on the plaintiff's seventh count, alleging a violation of CUTPA. The court subsequently granted that motion. Thus, at the time the jury was instructed of the law, its consideration was limited to the following claims: one count of breach of fiduciary duty with respect to the estate; one count each of legal malpractice with respect to the plaintiff in her individual capacity, as sole beneficiary of the estate, and as to the plaintiff in her representative capacity, as administratrix of the estate; and one count of wilful, wanton and reckless misconduct as a basis for seeking enhanced relief from the defendant, in the form of punitive damages, on each of the plaintiff's claims of breach of fiduciary duty and legal malpractice.

[15] The interrogatories provided by the court were subdivided into three sections, as follows: part one included interrogatory questions one through six, and dealt with the plaintiff's claim of breach of fiduciary duty; part two included interrogatory questions seven through nine, and dealt with the plaintiff's claim of legal malpractice against the defendant, in her capacity as administratrix of the estate; and part three included interrogatory questions ten through thirteen, and dealt with the plaintiff's claim of legal malpractice against the defendant, in her capacity as beneficiary of the estate. The final interrogatory, interrogatory number fourteen, was a damages summary table wherein the jury was instructed to report the total amount of damages, if any, that the plaintiff had proven to have had suffered.

[16] In the initial set of interrogatories, the jury indicated in interrogatory number four that the plaintiff had breached his fiduciary duty to the estate in five specific ways, more particularly, by: (1) failing to timely transfer real property to the plaintiff; (2) improperly including the corpus of a trust in the estate; (3) causing a delay in administering the estate; (4) improperly retaining joint account funds; and (5) misplacing approximately $90,000 of stock for a year and a half.

[17] Although the court remarked, prior to its supplemental instructions, that the jury had placed "zeros for all [of] those losses" in interrogatory number five, the portion of the initial interrogatories to which the court was referring does not contain zeros. Rather, the jury merely circled that entire portion of the interrogatories and placed a question mark in the margin beside it.

[18] After reviewing the jury's initial interrogatories, we conclude that the jury's second note referred to the damages summary table in interrogatory number fourteen and not the table accompanying interrogatory number five. See footnotes 15 and 17 of this opinion.

[19] The following exchange occurred outside the presence of the jury:

"Attorney Laney: Your Honor—Your Honor, before Sandra exits stage right—

"The Court: Yes.

"Attorney Laney: —are you proposing to send them a brand-new blank set of interrogatories?

"The Court: We're going to mark this one as—yes. We're going to mark the old one as—

"Attorney Laney: Well, shouldn't they have what they are working from so they know what they've already answered?

"The Court: All right.

"Attorney Laney: I mean, they have reached zeros on certain things.

"The Court: Well, they are saying that the zeros are things that they didn't really even find liability on.

"Attorney Laney: Right. But if you give them a blank set—

"The Court: All right. Give them a blank—okay. Just tell them to keep, preserve the old one. Tell them to preserve the old one.

"The Clerk: Okay.

"The Court: All right. Anything further from either side?

"Attorney Laney: No, Your Honor.

"Attorney Russell: No, Your Honor."

[20] In the final set of interrogatories, the jury made the following findings: (1) with respect to the plaintiff's claim for breach of fiduciary duty, the jury found that the plaintiff had failed to prove that the defendant had breached his fiduciary duty in *any* of the ways alleged in her operative complaint; (2) with respect to the plaintiff's claim of legal malpractice, brought in her capacity as administratrix of the estate, the jury found that the plaintiff had failed to prove that the defendant "departed from the standard of professional care owed by an attorney to the estate"; and (3) with respect to the plaintiff's claim of legal malpractice, in her capacity as beneficiary of the estate, the jury found that, although the plaintiff's relationship with the

defendant was "the functional equivalent of an attorney-client relationship," the plaintiff had failed to prove that the defendant "departed from the standard of professional care owed by an attorney to the beneficiary of the estate . . . ."

[21] See footnote 16 of this opinion.

[22] Practice Book § 16-18 states in relevant part: "The judicial authority may submit to the jury written interrogatories for the purpose of explaining or limiting a general verdict, which shall be answered and delivered to the clerk as a part of the verdict. . . . The judicial authority will not accept a verdict until the interrogatories which are essential to the verdict have been answered."

[23] See footnote 13 of this opinion.

[24] Practice Book § 16-34 states: "Upon an inquiry into the validity of a verdict, no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror nor any evidence concerning mental processes by which the verdict was determined. Subject to these limitations, a juror's testimony or affidavit shall be received when it concerns any misconduct which by law permits a jury to be impeached."

[25] See footnote 13 of this opinion.

[26] The defendant further argues that the initial interrogatories contained inconsistent findings because, on one hand, the jury indicated that the defendant engaged in self-dealing, fraud or conflict of interest—yet, on the other hand, indicated that the defendant had proven, by clear and convincing evidence, that any benefit gained from the estate was the product of fair dealing and *was not* the product of self-dealing, fraud or a conflict of interest.

We agree with the defendant that these findings raise a colorable issue as to whether the initial interrogatories contained legally inconsistent answers. We decline to address this alternative argument, however, because at this stage of the proceedings, the initial interrogatories contain excessive markings, circling, cross-outs, and the use of at least two different pens to modify preexisting answers. Accordingly, we are unable to discern and decline to speculate as to whether the initial interrogatories contained these inconsistent findings when they were first presented to the court.

[27] We are also reminded of our long-standing jurisprudence that it is "neither [the act of] giving assent to the verdict in the jury-room, nor the signing of a writing there, nor the delivery of it to the clerk, absolutely bound the conscience of the juror, but it was what he assented to in open court that [constitutes] the verdict . . . ." *McCaskey Register Co.* v. *Keena*, 81 Conn. 656, 660, 71 A. 898 (1909); see also *Ferris* v. *Hotel Pick Arms, Inc.*, 147 Conn. 72, 74, 157 A.2d 106 (1959) (noting that "the final assent of the jurors, given after the verdict has been read aloud by the clerk, accepted and ordered recorded by the court, and read aloud a second time by the clerk, makes the verdict"); cf. *Tisdale* v. *Riverside Cemetery Assn.*, supra, 78 Conn. App. 260–61, citing *McCaskey Register Co.* v. *Keena*, supra, 660.

It is undisputed on this record that the initial verdict form and interrogatories were not read aloud, nor did the jury assent to those findings in open court. Accordingly, the plaintiff's reliance on the mandatory language of Practice Book § 16-31 is misplaced.

[28] The plaintiff makes a related argument that the court had the duty to inform her that the jury had found punitive damages in her favor and that the court's failure to do so was reversible error. Arguably, she is correct in her assertion that the court should have apprised counsel of all of the inconsistent answers within the interrogatories. See *Intelisano* v. *Greenwell*, 155 Conn. 436, 450, 232 A.2d 490 (1967) ("Intelisano also claims that the court should have had the verdict in the first case read aloud before instructing the jury to reconsider. His claim is correct. The proper procedure is outlined in *Watertown Ecclesiastical Society's Appeal*, 46 Conn. 230, 232 [1878]. Needless deviations from this procedure invite appeals, although failure to follow it is not necessarily reversible error."). Better practice would be for the court to first review the verdict form and the interrogatories in their *entirety* in order to apprise itself of all of the potential inconsistencies therein. Thereafter, the court should address those inconsistencies with counsel outside the presence of the jury. We conclude, however, that the court's failure to do so in this case did not amount to reversible error.

[29] The plaintiff also asserts that the primary purpose of offering exhibit 88 into evidence was in support of her allegation that the defendant violated CUTPA. On March 25, 2015, following the close of evidence, the defendant moved for a directed verdict on the plaintiff's CUTPA claim. Although the trial court, *Povodator, J.*, reserved its ruling as of that date, the trial court subsequently found, "during the course of a charge conference . . . that

the plaintiff had failed to present sufficient evidence to allow the claim under CUTPA to be submitted to the jury, and eliminated all references to CUTPA from the charge and interrogatories." Thereafter, on March 31, 2015, the court formally granted the defendant's motion for a directed verdict on the plaintiff's CUTPA claim.

On appeal, the plaintiff does not challenge the propriety of the trial court's order granting the defendant's motion for a directed verdict on this count. We thus deem this claim abandoned and, accordingly, decline to consider exhibit 88's relevance to the plaintiff's CUTPA claim. See *Heyward* v. *Judicial Dept.*, 159 Conn. App. 794, 804, 124 A.3d 920 (2015) ("[b]ecause the [plaintiff] . . . failed to adequately brief any cognizable claim of error regarding the court's dismissal of the counts . . . we deem the claim abandoned").

[30] Below interrogatory number four, the parties had submitted a table wherein the jury was to circle "yes" or "no" next to each allegation as to why the defendant breached his fiduciary duty. Included amongst those potential breaches of duty were allegations that the defendant failed to keep accurate time records of the work being performed as executor and attorney for the estate.

[31] Although the plaintiff did attempt to impeach the defendant with a prior inconsistent statement as to whether the defendant was still pursuing additional fees from the plaintiff, the plaintiff did not attempt to impeach the defendant's testimony with the contents of exhibit 88.

[32] See footnote 20 of this opinion.